United States District Court
Southern District of Texas
**ENTERED**
August 27, 2024
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| JOHN BLUDWORTH SHIPYARD, LLC, § <br> § <br> Plaintiff, § <br> § <br> VS. § <br> § <br> CAPT FRANK BECHTOLT, *et al.*, § <br> § <br> Defendants. § § | CIVIL ACTION NO. 4:22-CV-03540 |

## ORDER

Before the Court are the following motions: (1) Claimant Caillou Island Towing Company, Inc.'s ("Caillou") Motion to Vacate (the "First Motion to Vacate") (Doc. #53); Plaintiff John Bludworth Shipyard, LLC's ("Plaintiff") Motion for Summary Judgment to Confirm Maritime Liens (the "Motion for Summary Judgment") (Doc. #61); and (3) Caillou's Second Motion to Vacate and, in the Alternative, Motion for Summary Judgment (the "Second Motion to Vacate") (Doc. #62). The Court held a hearing regarding the aforementioned motions on May 14, 2024, wherein the parties presented oral argument. Having considered the parties' arguments, the submissions, and the applicable legal authority, the Court grants Caillou's Second Motion to Vacate (Doc. #62), denies Caillou's First Motion to Vacate (Doc. #53) as moot, and denies Plaintiff's Motion for Summary Judgment (Doc. #61).

### I.     Background

This dispute involves three vessels: (1) the Capt. Frank Bechtolt ("Bechtolt"), owned by Claimant Manson Construction Co. ("Manson"); (2) the CIT-103, owned by Caillou; and (3) the Idler Spud Barge ("Idler"), formerly owned by T.W. LaQuay Marine, LLC ("LaQuay")—a non-

party that has disclaimed its ownership of the vessel. Doc. #25 ¶ 9. In June 2018, Caillou entered a charter agreement with LaQuay which allowed LaQuay to use the CIT-103 for various projects. Doc. #62, Ex. 2 ¶¶ 4–5. While the agreement was not reduced to writing, Caillou transferred control of the CIT-103 such that LaQuay became the bareboat charterer[1] of the vessel. Doc. #61, Ex. 7 at 10. Likewise, on February 11, 2020, Manson and LaQuay entered into an agreement making LaQuay the bareboat charterer of the Bechtolt. Doc. #61, Ex. 5 at 2.

Plaintiff is a limited liability company that constructs, repairs, and modifies marine vessels. Doc. #61, Ex. 1 at 2. In April 2020, Plaintiff entered into an agreement with LaQuay to provide services to the Bechtolt, CIT-103, and Idler (collectively, the "Vessels"). *Id.* at 4–5. Manson and Caillou did not consent to or have knowledge of LaQuay hiring Plaintiff. Doc. #62, Ex. 2 ¶¶ 9–10; Doc. #49 at 2; Doc. #50 at 2; Doc. #61, Ex. 1 at 4. As a result of the work Plaintiff provided, the three Vessels were effectively combined into a single dredging unit, as pictured below. Doc. #61 at 3, Ex. 2 ¶ 6.



---

[1] "A bareboat charter is 'tantamount to, though just short of, an outright transfer of ownership.'" *Limon v. Berryco Barge Lines, LLC*, No. CIV.A. G-07-0274, 2011 WL 835832, at *4 (S.D. Tex. Mar. 7, 2011) (quoting *Agrico Chem. Co. v. M/V Ben W. Martin*, 664 F.2d 85, 91 (5th Cir. 1981)). Thus, "A bareboat charterer is an owner pro hac vice and 'has unrestricted use of the vessel.'" *Id.* (quoting *Kerr–McGee Corp. v. Ma–Ju Marine Servs., Inc.*, 830 F.2d 1332, 1342 n.11 (5th Cir. 1987)).

LaQuay intended to use the unit to engage in dredging work along the Gulf coast. *Id.* Prior to Plaintiff combining the Vessels, the CIT-103 was an unpowered flat deck barge, but it has now been converted into a "booster barge."[2] Doc. #62, Ex. 2 ¶¶ 3, 11. The Bechtolt, which was always a dredge vessel, was modified and combined with the CIT-103 and Idler to perform the dredging work LaQuay intended. Doc. #61, Ex. 2 ¶ 7. And the Idler was converted into a "spud barge."[3] *Id.* Plaintiff finished its work on the Vessels on September 3, 2020, at which point the consolidated dredging unit was released to LaQuay. *Id.* ¶ 9.

On September 30, 2020, Plaintiff sent an invoice to LaQuay for the work it did on the three Vessels. Doc. #61, Ex. 4. LaQuay never paid any part of the invoice. Doc. #61, Ex. 2 ¶ 11. On December 9, 2021, LaQuay filed for bankruptcy. *Id.* ¶ 15. Plaintiff appeared in the bankruptcy proceeding to submit a proof of claim for its claims against LaQuay and assert maritime liens against the three Vessels. *Id.* It was during the bankruptcy proceedings that Plaintiff first learned that the Bechtolt and CIT-103 were the subject of bareboat charter agreements. Doc. #61, Ex. 1 at 4.

The bankruptcy stay lifted with respect to the Bechtolt on August 26, 2022. Doc. #19, Ex. 3. On October 13, 2022, Plaintiff filed its Verified Complaint, requesting that the Bechtolt be arrested and claiming it has a maritime lien over the vessel. Doc. #1. On October 17, 2022, the Court issued a vessel seizure warrant for the Bechtolt, and the vessel was arrested accordingly on October 18, 2022. Doc. Nos. 7, 10. On March 3, 2023, the bankruptcy stay was lifted with respect

---

[2] Plaintiff describes a "booster barge" as "a barge which houses a booster pump, which allows a dredge pump to operate more efficiently while also reducing the wear and tear on other equipment." Doc. #61, Ex. 2 ¶ 7.
[3] According to Plaintiff, "[a] spud is essentially a long stake that is driven into a sea or lake bed to pinion a dredge to the bottom, so that it remains secured in place while operating." Doc. #61, Ex. 2 ¶ 7.

3

to the CIT-103 and Idler. Doc. #24, Ex. 1. On March 8, 2023, Plaintiff filed its First Amended Verified Complaint, requesting the arrest of the CIT-103 and Idler and asserting maritime liens over the vessels. Doc. #25. On March 31, 2023, the Court issued warrants for the arrest of the CIT-103 and Idler, and the vessels were arrested on April 6, 2023. Doc. Nos. 33, 34, 37, 38. Manson and Caillou filed statements of right to the Bechtolt and CIT-103, respectively. Doc. Nos. 16, 43. On July 14, 2023, the Court entered an order defaulting all potential parties that failed to timely assert a statement of claim to any of the Vessels. Doc. #45.

On September 8, 2023, Caillou filed its First Motion to Vacate, requesting that the Court vacate the arrest of the CIT-103 because any lien Plaintiff may have over the vessel has been extinguished by the doctrine of laches. Doc. #53. On February 28, 2024, Plaintiff filed its Motion for Summary Judgment, asking the Court to confirm the validity and enforceability of its maritime lien claims for necessaries provided to the three Vessels. Doc. #61. Also on February 28, 2024, Caillou filed its Second Motion to Vacate, arguing that the Court should either vacate the arrest of the CIT-103 or grant summary judgment on all of Plaintiff's claims against the CIT-103 because Plaintiff did not provide "necessaries" and Plaintiff did not rely on the credit of the CIT-103. Doc. #62. The Court will first consider Caillou's Motions to Vacate together. Then, the Court will turn to Plaintiff's Motion for Summary Judgment.

**II.     Legal Standards**

    **a.     Supplemental Admiralty and Maritime Claims Rule E**

Under Supplemental Admiralty and Maritime Claims Rule E of the Federal Rules of Civil Procedure, "[w]henever property is arrested or attached, any person claiming an interest in it shall be entitled to a prompt hearing at which the plaintiff shall be required to show why the arrest or attachment should not be vacated or other relief granted consistent with these rules." FED. R. CIV.

P. SUPP. R. E(4)(f). When faced with a motion to vacate under Rule E(4)(f), a plaintiff must show that it has "reasonable grounds for the arrest and attachment and that it should be maintained." *Seatrade Grp. N.V. v. 6,785.5 Tons of Cement*, No. CIV.A. H-05-2771, 2005 WL 3878026, at *2 (S.D. Tex. Dec. 7, 2005) (citing *Salazar v. Atlantic Sun*, 881 F .2d 73, 79 (3d Cir. 1989); *Amstar Corp. v. S/S Alexandros T.*, 664 F.2d 904, 912 (4th Cir. 1981); *Parcel Tankers, Inc. v. Formosa Plastics Corp.*, 764 F.2d 1153, 1155 (5th Cir. 1985)). Moreover, "[t]he plaintiff must show by a preponderance of the evidence that it is entitled to a valid lien" by making "a *prima facie* showing that it is entitled to the damages sought and secured by the arrest and attachment." *Id.* (citation omitted). "A Rule E(4)(f) hearing is not intended definitely to resolve the dispute between the parties, but only to make a preliminary determination of whether there are reasonable grounds for issuance of the arrest warrant." *Id.*

### b. Federal rule of Civil Procedure 56(a)

Summary judgment is proper where there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). "A genuine dispute as to a material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Rogers v. Bromac Title Servs., L.L.C.*, 755 F.3d 347, 350 (5th Cir. 2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "The moving party bears the initial burden on demonstrating the absence of a genuine issue of material fact." *Carnes Funeral Home, Inc. v. Allstate Ins. Co.*, 509 F. Supp. 3d 908, 915 (S.D. Tex. 2020) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). If that burden is met, "the burden shifts to the non-moving party to set forth specific facts showing a genuine issue for trial." *Id.* (citing FED R. CIV. P. 56(e)). Courts must "construe[] 'all facts and inferences in the light most favorable to the nonmoving party.' Summary judgment may not be thwarted by conclusional allegations,

unsupported assertions, or presentation of only a scintilla of evidence." *McFaul v. Valenzuela*, 684 F.3d 564, 571 (5th Cir. 2012) (quoting *Dillon v. Rogers*, 596 F.3d 260, 266 (5th Cir. 2010)).

### III. Analysis

#### a. Caillou's Motions to Vacate

In Caillou's First Motion to Vacate, it argues that the arrest of the CIT-103 should be vacated because, to the extent Plaintiff ever acquired a maritime lien against the CIT-103, such lien has been extinguished by the doctrine of laches. Doc. #53, Ex. 1 at 1. Caillou's Second Motion to Vacate argues that the Court should vacate the arrest of the CIT-103 or grant summary judgment on all of Plaintiff's claims against the CIT-103 because (1) Plaintiff did not provide "necessaries" to the CIT-103 and (2) Plaintiff did not rely on the credit of the CIT-103 when it contracted with LaQuay. *See* Doc. #62, Ex. 1. As discussed in detail below, because the Court finds that Plaintiff did not provide necessaries to the CIT-103, the Court addresses only this argument from the Second Motion to Vacate and denies the First Motion to Vacate as moot.

"Under the Commercial Instruments and Maritime Liens Act ('CIMLA'), 46 U.S.C. §§ 31301–31343, a person may obtain a maritime lien against a vessel by providing it with 'necessaries.'" *Martin Energy Servs., L.L.C. v. Bourbon Petrel M/V*, 962 F.3d 827, 829 (5th Cir. 2020); *see* 46 U.S.C.A. § 31342(a)(1)–(2) ("[A] person providing necessaries to a vessel on the order of the owner or a person authorized by the owner . . . has a maritime lien on the vessel" and "may bring a civil action in rem to enforce the lien . . . ."). "The lien 'is a special property right in the vessel,' which 'grants the creditor the right to appropriate the vessel, have it sold, and be repaid the debt from the proceeds.'" *Martin Energy*, 962 F.3d at 830 (quoting *Equilease Corp. v. M/V Sampson*, 793 F.2d 598, 602 (5th Cir. 1986) (en banc)). Courts in this Circuit "apply the provisions of CIMLA *stricti juris* to ensure that maritime liens are not lightly extended by construction,

6

analogy, or inference." *Valero Mktg. & Supply Co. v. M/V Almi Sun, IMO No. 9579535*, 893 F.3d 290, 292 (5th Cir. 2018) (internal quotations and citation omitted).

Though CIMLA does not explicitly define "necessaries," the statute "furnishes an illustrative list: 'repairs, supplies, towage, and the use of a dry dock or marine railway.'" *Id.* (quoting 46 U.S.C. § 31301(4)). As the Fifth Circuit has described, necessaries are "most goods or services that are useful to the vessel, keep her out of danger, and enable her to perform her particular function. Necessaries are the things that a prudent owner would provide to enable a ship to perform well the functions for which she has been engaged." *Equilease Corp.*, 793 F.2d at 603 (citation omitted). What constitutes a necessary depends on the want or requirements of the vessel, rather than the character of the thing provided to the vessel. *Id.* Thus, necessaries are those things "useful to vessel operations and necessary to keep the ship going." *Martin Energy*, 962 F.3d at 831 (internal quotations and citations omitted); *see also Cent. Boat Rentals, Inc. v. M/V Nor Goliath*, 31 F.4th 320, 323 (5th Cir. 2022) ("We look to the 'particular function' and requirements of a ship to determine what is a necessary for that ship.").

In *Martin Energy*, three vessels (the "Support Vessels") owned by C.G.G. Services, U.S., Inc. ("CGG") were used to supply other vessels (the "Seismic Vessels") with fuel, supplies, and equipment needed to conduct seismic surveying operations. *Id.* at 829–30. CGG purchased fuel from the plaintiff, which was delivered to the Support Vessels. *Id.* at 830. Each of the Support Vessels had a cargo tank for carrying the fuel that would be used in the Seismic Vessels, and that cargo tank was distinct from the fuel for the Support Vessels themselves. *Id.* When CGG failed to pay the invoices for the fuel that the plaintiff provided, the plaintiff asserted maritime liens against the Support Vessels. *Id.* The Fifth Circuit held that the fuel did not constitute "necessaries" under CIMLA because the fuel was meant to serve the Seismic Vessels, not the Support Vessels.

7

*Id.* at 832–33.

      The Fifth Circuit relied on *Martin Energy* in *Central Boat Rentals*, which involved a general contractor that decommissioned oil platforms in the Gulf of Mexico. *Cent. Boat Rentals*, 31 F.4th at 322, 324. The general contractor hired the M/V Nor Goliath, a heavy lift vessel, "to lift oil platform components out of the water and place them onto barges." *Id.* "Tugboats then towed the loaded barges from the Nor Goliath's location in the Gulf to an inland scrapyard for further dismantling, returning to the Nor Goliath with empty barges." *Id.* When the general contractor went bankrupt, the companies that owned the tugboats asserted maritime liens under CIMLA against the Nor Goliath. *Id.* at 323. The Fifth Circuit rejected the towing companies' argument that the Nor Goliath's "particular function was the entirety of the decommissioning process" because that was the goal of the general contractor, rather than the vessel itself. *Id.* at 323–24. Instead, because "the Nor Goliath's role was to lift platform components and place them on the barges, its necessaries are goods or services it used for this particular function." *Id.* at 324. Accordingly, the Fifth Circuit held that the towing companies did not provide necessaries to the Nor Goliath because "the barges were not equipment for the Nor Goliath" and "did not help the Nor Goliath's crane raise and lower the platform components." *Id.*

      Like in *Martin Energy*, the services Plaintiff provided to the CIT-103 were for the benefit of *other* vessels. Plaintiff has admitted that the modifications it made to the CIT-103 "were to serve the Bechtolt." Doc. #62, Ex. 3 at 51–52. Specifically, Plaintiff converted the CIT-103 so it could "serve[] as a platform for auxiliary equipment . . . for the dredge to be utilized." *Id.* at 50. Moreover, as in *Central Boat Services*, Plaintiff did not provide services necessary to the CIT-103's particular function, but rather the overall goal of LaQuay. Here, the "particular function" of the CIT-103 was to operate as a flat unpowered deck barge that loaded and transported equipment

using a tugboat as motive power. Doc. #62, Ex. 2 ¶ 3. All of the work that Plaintiff did on the CIT-103 was not to serve this particular function. Rather, it was to serve the goal of LaQuay to combine three vessels—all of which served different purposes—into one dredge unit. Doc. #62, Ex. 3 at 9–10. While Plaintiff made modifications and added several pieces of equipment to the CIT-103, such as a booster pump, engines, fuel takes, pumps, and electrical components, all of this was done "for the purpose of [LaQuay's] dredge project." Doc. #62, Ex. 1 at 4, Ex. 2 ¶ 16, Ex. 3 at 9–10, 21; Doc. #66 at 5. Based on the foregoing, the Court finds that that the services Plaintiff provided to the CIT-103 did not serve the particular function of the vessel itself.

Plaintiff argues that it provided necessaries because "only the perspective and desires of LaQuay are relevant." Doc. #66 at 5. However, the Fifth Circuit has held that "a 'necessary' is determined by *the need of the vessel*." *Martin Energy*, 962 F.3d at 833 (rejecting the notion that the maritime lien analysis should take into account the "perspectives of the vendor") (emphasis added). Moreover, the "necessaries" analysis does not focus on the entirety of a particular project or system that a vessel might partake in, but rather the "particular function" of the vessel itself. *See Cent. Boat Rentals*, 31 F.4th at 324 (rejecting the argument that the Nor Goliath's particular function was "the entirety of the decommissioning process"). In addition, Plaintiff does not cite any authority that stands for the proposition that modifications to one vessel so that it can be combined with separate vessels and serve the purposes of those vessels constitutes necessaries to create a maritime lien. This "absence of precedent signifies the weakness of [Plaintiff's] position since admiralty enjoys an unusually rich legal tradition and, more than nearly any other contemporary area of federal law, relies on venerable precedents where they exist." *Gulf Marine & Indus. Supplies, Inc. v. GOLDEN PRINCE M/V*, 230 F.3d 178, 180 (5th Cir. 2000). Thus, the Court finds that Plaintiff did not provide necessaries to the CIT-103 and has therefore failed to

demonstrate a legal basis for its claimed maritime lien against the CIT-103. Caillou's Second Motion to Vacate is therefore granted, and its First Motion to Vacate is denied as moot.

### b. Plaintiff's Motion for Summary Judgment

In its Motion for Summary Judgment, Plaintiff asks the Court to confirm the enforceability of its maritime liens against the CIT-103, Bechtolt, and Idler, and to render judgment in favor of Plaintiff on its claims against each of the Vessels. Doc. #61 at 12–13. The Court has already disposed of Plaintiff's claims against the CIT-103. *Supra* pp. 5–10. The remaining issue is whether Plaintiff has enforceable maritime liens as a matter of law against the Bechtolt and Idler. The Court will address each of these vessels in turn.

#### 1. The Bechtolt

Manson argues that the Court should not grant summary judgment on Plaintiff's claims against the Bechtolt because fact issues exist as to whether Plaintiff provided necessaries and whether Plaintiff relied on the Bechtolt's credit. Doc. #67 at 6–9. Because there are fact issues with respect to whether Plaintiff provided necessaries to the Bechtolt, the Court only addresses this argument. As the Court already explained in resolving Caillou's Motions to Vacate, under CIMLA, necessaries are "most goods or services that are useful to the vessel, keep her out of danger, and enable her to perform her particular function. Necessaries are the things that a prudent owner would provide to enable a ship to perform well the functions for which she has been engaged." *Equilease Corp.*, 793 F.2d at 603 (citation omitted).

With respect to the Bechtolt, Plaintiff did a "significant amount of work." Doc. #67, Ex. 1 at 31. Specifically, the Bechtolt vessel was "abrased and blasted and coated"; the "ladder was removed and modified"; "sponsons" were added; the pump was modified; the pontoons were extended; "swing winches" were added; the "thru-hull connection" was modified; the fenders were

removed and tire hangers were added; anodes were added; sea valves and strainers were removed and replaced; doors on the engine room were repaired; the generator was removed and machinery guards were added; a new stairway was added with guardrails and handrails; piping was added and modified in several areas; and hatches were removed and replaced. *Id.* at 28–31. In addition, Plaintiff did work to connect the Bechtolt to the CIT-103. *Id.* at 31. However, Plaintiff has made clear that the work it did to the Bechtolt was done in order to create an entirely new "unit" with the Idler and CIT-103. Doc. #61, Ex. 2 ¶ 6. Thus, fact issues exist as to whether all of the services Plaintiff provided to the Bechtolt were necessaries that were specifically "useful" to the Bechtolt herself, "ke[pt] *her* out of danger," or "enable[d] *her* to perform her particular function." *See Equilease Corp.*, 793 F.2d at 603 (emphasis added). In other words, there are fact issues with respect to whether Plaintiff's services served the Bechtolt's particular function, or the function of the CIT-103 and Idler, or perhaps even the function of the entirely "new" vessel that the Bechtolt served to create.

Moreover, as the parties have all pointed out in their briefing, this case presents unique factual circumstances that appear to be a matter of first impression: an attempt to assert maritime liens over three separate vessels based on services that effectively turned the three vessels into a single new vessel. As such, there is no precedent to support the Court finding as a matter of law that the services Plaintiff provided to the Bechtolt constitute necessaries. *See Gulf Marine & Indus. Supplies, Inc.*, 230 F.3d at 180 (noting that the "absence of precedent signifies the weakness of [the plaintiff's] position since admiralty enjoys an unusually rich legal tradition and, more than nearly any other contemporary area of federal law, relies on venerable precedents where they exist"); *Valero Mktg. & Supply Co.*, 893 F.3d at 292 (emphasizing that courts should "apply the provisions of CIMLA *stricti juris* to ensure that maritime liens are not lightly extended by

11

construction, analogy, or inference"). Thus, because there are fact issues with respect to whether Plaintiff provided necessaries to the Bechtolt, Plaintiff's Motion for Summary Judgment is denied with respect to that vessel.

### 2. The Idler

No claimants have asserted rights to the Idler, which is presumed to be owned by LaQuay, and thus there has been no opposition filed to Plaintiff's Motion for Summary Judgment with respect to that vessel. However, "[a] motion for summary judgment cannot be granted simply because there is no opposition." *Hetzel v. Bethlehem Steel Corp.*, 50 F.3d 360, 362 n.3 (5th Cir. 1995) (internal quotations and citation omitted). In this case, for many of the same reasons that the Court discussed with respect to the Bechtolt and CIT-103, it is unclear whether Plaintiff furnished services to the Idler to "enable her to perform her particular function." *Equilease Corp.*, 793 F.2d at 603 (citation omitted). Indeed, Plaintiff fails to outline in its Motion for Summary Judgment, with any specificity, the services it rendered to the Idler. *See* Doc. #61. The only details provided are that Plaintiff converted the Idler into a "spud barge" by adding a spud, which would help the new combined dredge unit secure to the ocean floor while it performed its dredging operations. Doc. #61, Ex. 2 ¶ 7. This alone creates a fact issue regarding whether Plaintiff added the spud to enable the Idler to perform *her* particular function, rather than to assist the Bechtolt or to serve LaQuay's wish to create an entirely new dredging unit. Thus, because there are fact issues as to whether Plaintiff provided necessaries to the Idler, the Court denies Plaintiff's Motion for Summary Judgment as to that vessel.

### IV. Conclusion

In conclusion, the Court finds that Plaintiff did not provide necessaries to the CIT-103. Accordingly, Caillou's Second Motion to Vacate (Doc. #62) is hereby GRANTED and the arrest

of the CIT-103 is lifted. Because the Court has vacated the arrest of the CIT-103, Caillou's First Motion to Vacate (Doc. #53) is DENIED as MOOT. Moreover, because fact issues exist with regard to whether Plaintiff provided necessaries to the Bechtolt and Idler, Plaintiff's Motion for Summary Judgment (Doc. #62) is DENIED.

    It is so ORDERED.

\_\_\_\_AUG 2 7 2024\_\_\_\_         _____
Date                             The Honorable Alfred H. Bennett
                                       United States District Judge